The **BORDEN COMPANY**, Petitioner,

v.

**FEDERAL TRADE COMMISSION**,
Respondent.

No. 20463.

United States Court of Appeals
Fifth Circuit.

Dec. 4, 1964.

John F. Wood, Philip S. Campbell, Kent V. Lukingbeal, New York City, C. Brien Dillon, Moulton Goodrum, Jr., Houston, Tex., Robert C. Johnston, New York City, Cecil I. Crouse, New York City, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Baker, Botts, Shepherd & Coates, Houston, Tex., of counsel, for petitioner.

Charles C. Moore, Jr., Atty., F.T.C., J. B. Truly, Asst. Gen. Counsel, F.T.C., James McI. Henderson, General Counsel, F.T.C., Washington, D. C., for respondent.

Before HUTCHESON, RIVES and BROWN, Circuit Judges.

JOSEPH C. HUTCHESON, Jr., Circuit Judge:

This is a petition by the Borden Company to review and set aside a cease and desist order of the Federal Trade Commission[1] based upon its decision that Borden had violated Section 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), the pertinent portion of which provides:

> "It shall be unlawful * * * to discriminate in price between different purchasers of commodities of like grade and quality * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: * * * *".

The challenged order is based on the Commission's decision that Borden violated Section 2(a) by discriminating in price between purchasers of its private label evaporated milk, sold under brand labels owned by the customer, and purchasers of its Borden brand evaporated milk.

The Borden Company is engaged in the manufacture, processing, distribution and sale of food, dairy and chemical products. Since about 1938 it has been selling both Borden brand and private label evaporated milk. (The use of the term "milk" in this opinion is intended to refer only to evaporated milk.) The Borden brand, like the Carnation and Pet brands, was sold on a delivered price basis which was uniform throughout the country. The private label milk was sold by Borden on an f. o. b. plant basis, with prices determined under a cost-plus formula. In 1956 and 1957 Petitioner expanded its private label operations to its two southern plants, located at Lewisburg, Tennessee, and Chester, South Carolina, which had not previously packed private label milk. As a result of these new operations some private label business which had been served by other packers shifted to Borden. This litigation ensued.

Borden has always sold its private label evaporated milk at lower prices than its Borden brand evaporated milk. The record indicates that it made no general offer to sell private label milk, nor did it solicit such orders. The customers who were supplied with the private label product approached Borden and asked it to make the private label milk available in addition to the Borden brand. These customers all continue to buy and stock the Borden brand along with their own private label brand. The private label milk which Borden sells is chemically identical to Borden brand and is packed in the same way except that private brand labels belonging to the customer are put on the cans instead of the Borden

1. The Commission, with two members not participating and one member dissenting, entered its order with the concurrence of two of its five members.

brand labels. The private label milk is sold f. o. b. at a price determined by a cost-plus formula through which Borden adds a margin of profit to the actual cost of producing the milk at the particular plant from which it is shipped. The private label price varies from plant to plant and from month to month at each plant, but is always substantially lower than the Borden brand price which is uniform throughout the country. It is this difference in price between Borden brand milk and private label milk that the Commission attacks as price discrimination.

The Hearing Examiner found Borden had discriminated in price between purchasers of the Borden brand and private label milk and that such products were of like grade and quality, but he found that this practice had not injured competition and that it was not likely to injure competition, and that, in any event, the difference in price had been cost justified. He ordered the complaint dismissed, but the Commission reversed the Examiner and found potential injury in both the primary and secondary lines of competition and rejected Borden's cost justification defense. It ordered Petitioner to cease and desist from discriminating in price between competing purchasers of food products of like grade and quality.

Our initial determination must necessarily be whether or not the Commission applied the correct legal test in deciding that the commodities sold at different prices were of "like grade and quality". The facts on this element of the case are undisputed. The question is purely one of law, turning on the proper construction of the statutory phrase "of like grade and quality". If the products were not of like grade and quality, within the meaning of the Act, then their sale does not fall within the prohibition of Section 2(a). It is vigorously asserted by the Petitioner that Borden brand evaporated milk and the private label evaporated milk sold by Borden are not "commodities of like grade and quality".

The Commission's finding that Borden brand evaporated milk and the private label milk produced and sold by Borden are of like grade and quality is based on the undisputed fact that the chemical content of the products is identical. They are packed exactly the same except that the private label milk does not bear the Borden brand label. The private label milk bears the brand owned by the purchaser for whom it is packed. Its label does not show that the milk was packed or in any manner handled by Borden. Under the construction of the Act adopted here by the Commission the "like grade and quality" determination was based solely on the physical properties of the products without regard to the brand names they bear or the relative public acceptance enjoyed by each.

Borden contends that the grade and quality of products may vary either because of differences in "intrinsic superior quality" or because of "intense public demand" for one product as compared with another. It asserts that a sharp distinction between premium and non-premium products prevails in the evaporated milk business and that there are three well-known premium brands (Carnation, Pet, and Borden) which customarily command a substantially higher price than the other brands. It contends that private label milk, regardless of who packs it, must be sold at lower prices. Petitioner says the higher price commanded by Borden brand at all levels of distribution is due to the "intense public demand" for the product rather than to any "intrinsic superior quality". Borden puts the same milk in the private label cans as in the Borden brand cans. Chemically, the two products are the same, but Petitioner asserts, commercially, they are quite different. One is a premium product, the other non-premium, Borden contends, and they should be priced accordingly.

The record clearly establishes that Borden brand evaporated milk does command a higher price than private label milk at all levels of distribution. Customers at the retail level are willing to

pay more for it than for private label because of the Borden name.[2] The wholesalers who testified recognized that private label milk customarily sells at prices substantially below the premium price commanded by Borden brand milk and the other nationally advertised brands.[3] That the Borden brand is recognized at the manufacturer's level as a premium product is illustrated by the fact that the wholesalers and retailers who bought private label milk from Borden at the lower prices nevertheless kept right on buying Borden brand, at the higher price, in approximately the same quantities. They, in effect, treated one as a premium line, the other as non-premium, recognizing that the Borden brand milk would command a higher price on resale than would the private label milk.

The basic issue presented here then is whether the demonstrated consumer preference for the Borden brand product over the private label product is to receive legal recognition in the "like grade and quality" determination. The legislative history of the Act is of little assistance on this point. The members of the Attorney General's National Committee to Study the Antitrust Laws were divided on the question,[4] as are the antitrust commentators.[5] We find no case which controls our disposition of this issue.

In construing the Robinson-Patman Act we are mindful of the language of the Supreme Court in Automatic Canteen Co. of America v. F. T. C., 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953). The court there said the Act should be interpreted and applied consistently with "the broader antitrust policies that have been laid down by Congress" and so to avoid "a price uniformity and rigidity in open conflict with the purposes of other antitrust legislation".[6] Were we to ignore the fact that a brand name product may be able to command a higher price than an unknown brand because of its public acceptance, then we would be encouraging just such a price uniformity and rigidity, in conflict with the realities of the mar-

---

2. For example, one retail grocer testified as follows:

"A. Some people say they want [Borden's] Silver Cow milk. In other words, for maybe a coupon on the side of the can or because they have been educated to want that brand. Some of them won't have anything but that. Some of them won't have anything except Carnation, and some of them won't want anything except Pet.

"Q. They don't care what price—

"A. If the doctor tells the woman to put the baby on Pet milk, that is all she wants, you couldn't interest her in something else."

3. As one wholesaler put it, "Private label merchandise is no good for nobody unless there is a price on it. * * * In the retail trade as a whole they haven't been too much interested in · [private label evaporated milk] * * * frankly if it was the same price as advertised or 15 cents or 25 cents a case under, it wouldn't sell, they couldn't give it away. * * * It has got to have $1.50 or $2 a case spread to make it interesting."

4. The majority of the Committee recommended that the economic factors inherent in brand names and national advertising should not be considered in the jurisdictional inquiry under the statutory "like grade and quality" test, but should be taken into account in the injury to competition and cost justification provisions of the statute. The minority of the Committee urged that "significant consumer preferences" be taken into account under the like grade and quality provision, treating demonstrable economic differences as calling for evaluation under "grade" as distinct from any purely physical consideration of "quality". Report of the Attorney General's National Committee to Study the Antitrust Laws 158–159 (1955).

5. In accord with the view of the majority of the Committee are Patman and Austin; Austin, Price Discrimination Under the Robinson-Patman Act, 39 (1959); Patman, Complete Guide to the Robinson-Patman Act, 23, 35 (1936). Rowe is of a contrary opinion. Rowe, Price Discrimination Under the Robinson-Patman Act, 76 (1962).

6. 346 U.S. 61, 63, 74, 73 S.Ct. 1017, 1019, 1025.

ketplace and congressional antitrust policies. An established brand name may have a large following among purchasers. This fact can be of great economic significance in a competitive market. We do not believe it was the intention of Congress that such clearly demonstrable consumer preferences should simply be ignored in determining when products may be priced differently. As a practical matter, such preferences may be far more significant in determining the market value of a product than are its physical characteristics. It is both proper and consistent with the broad antitrust policy of Congress that they be given recognition under the "like grade and quality" test of the Act. In determining whether products are of like grade and quality, consideration should be given to all commercially significant distinctions which affect market value, whether they be physical or promotional.

The Commission relies primarily upon this Court's opinion in Hartley & Parker, Inc. v. Florida Beverage Corp., 307 F.2d 916 (5th Cir. 1962), a treble damage action in which we upheld the sufficiency of the charge in a complaint that the respondent discriminated in price by selling its nationally advertised liquors at one price while selling identical liquors under different labels to a favored customer at a lower price. That decision clearly does not control this case. The complaint which we upheld there affirmatively alleged that the products, although labeled differently were sold "upon the express representation that [the lower priced liquors] were in reality higher priced nationally advertised brands * * * packaged and labeled under different trade names". The label differences were rendered commercially insignificant because both labels were represented and sold as one and the same product. In the present case, by contrast, the private label customers were forbidden to make any use of the Borden name in selling the private label milk and, so far as the record disclosed, they never represented the private brands to be Borden products. In this case, the brand name had commercial significance. Whatever significance the brand names might have had in Hartley & Parker, absent the seller's representation that the differently labeled products were the same was nullified by that representation.

We do not find the administrative precedents urged upon us by the Commission applicable to this case.[7] Although it is true that these administrative decisions all treated goods of differing brands as being of like grade and quality, they are, however, clearly distinguishable from this case. In none of those cases was there any showing that the purchasers paying the higher prices had received brand-name products which readily commanded a premium price in the market, while the purchasers paying the lower prices did not. The brand names were not shown to have any effect on the ultimate price the products could command. Here the Borden brand label was clearly of commercial significance. At all levels of distribution it imparted a premium market value to the Borden product which the private label product did not enjoy. That the Borden brand product should sell for a higher price than the lesser known private brands came as no surprise to anyone.

The Commission precedent would be of some weight if we were here holding that the mere affixing of different labels to physically identical products is sufficient to make them different in grade, but we do not so hold. It is only when those labels are proven to have demonstrable commercial significance that they can change the grade of a prod-

---

7. The Commission relies upon its line of decisions holding that goods which are the same in all respects except labels are of like grade and quality for the purposes of Section 2. Page Dairy Co., 50 F.T.C. 395 (1953); United States Rubber Co., 46 F.T.C. 998 (1950); United States Rubber Co., et al., 28 F.T.C. 1489 (1939); The Goodyear Tire & Rubber Co., 22 F.T.C. 232 (1936), reversed on other grounds 101 F.2d 620 (6th Cir. 1939).

uct. Different labels may be of no economic significance whatsoever. However, where it is demonstrated that a label enjoys a significant consumer acceptance such that buyers are willing to pay more for the product which bears that brand, then it is clearly of commercial significance in the most direct and obvious way—namely, it causes the product to sell for a consistently higher price in a competitive market. That is not to say that merely attaching different, but comparable brand labels to two products will, without more, make them of unlike "grade". Such an artificial distinction, unaccompanied by any significant difference in the public acceptance of the two brands would provide an easy means of evading the Act. A manufacturer would be free to discriminate in price between purchasers merely by affixing comparable, but different, private labels to the goods sold to each of them. We do not countenance such a practice, but merely recognize the demonstrated commercial significance of the Borden brand here, as compared to the private label brands.[8] The record shows that identification with the Borden Company through its brand name has value in the evaporated milk market. That value has been clearly proven by Borden in this case and it should be allowed to take it into account in pricing its products.

The Commission precedents which are more analogous to this case are those involving the closely related "meeting competition" defense under Section 2(b). There the Commission has given full recognition to the significance of the higher prices commanded by premium products in holding that a seller who reduces the price of his premium product to the level of his non-premium competitors is not merely meeting competition, but undercutting it.[9] The most recent example is Callaway Mills Co., 3 Trade Reg.Rep.Ph. 16800 (F.T.C. Feb. 10, 1964) where the Commission rejected the seller's meeting competition defense on the ground that it had failed to prove that its carpeting was "similar in grade and quality" to that of the competitor's whose prices it was meeting. The Commission stated that:

"Both the courts and the Commission have consistently denied the shelter of the [meeting competition] defense to sellers whose product, because of intrinsic superior quality or intense public demand, normally commands a price higher than that usually received by sellers of competitive goods".

The Commission apparently assigned to the "grade" concept the public demand

8. As pointed out by the Second Circuit in Atlanta Trading Corp. v. F. T. C., 258 F.2d 365 (2nd Cir. 1958), "The test of products of like grade and quality was evolved to prevent emasculation of the section by a supplier's making artificial distinctions in his product but this does not mean that all distinctions are to be disregarded". In setting the Commission's order aside the Court held that certain pork products were not of like grade and quality, pointing out, among other things that the Commission had failed to take account of the prices at which the products sold.

9. As the Commission stated in Anheuser-Busch, Inc., 54 F.T.C. 277 (1957), "It is evident that Budweiser could and did successfully command a premium price in the St. Louis market as it has in most

of the other markets in the nation. The test in such a case is not necessarily a difference in quality but the fact that the public is willing to buy the produce at a higher price in a normal market".

Similarly in Standard Oil Co., 49 F.T.C. 923 (1953) the Commission stated, "There was no evidence as to whether or not Fleet Wing gasoline was of comparable grade or quality with respondent's gasoline. Regardless of this, in the retail distribution of gasoline public acceptance rather than chemical analysis of the product is the important competitive factor."

See also Minneapolis-Honeywell Regulator Co., 44 F.T.C. 351, rev'd on other grounds, 191 F.2d 786 (7th Cir. 1951), cert. dismissed, 344 U.S. 206, 73 S.Ct. 245, 97 L.Ed. 245 (1952).

or salability characteristics of a product and to the "quality" concept its intrinsic or physical characteristics. This approach cuts both ways. If it is appropriate in considering the grade and quality of products for purposes of Section 2(b), it is equally applicable to that determination under Section 2(a). We cannot approve of the Commission's construing the Act inconsistently from one case to the next, as appears most advantageous to its position in a particular case. The ambiguities of the Robinson-Patman Act are troublesome enough without further muddying the water through inconsistent administrative determinations dealing with important questions of law. Ultimately it is the Court which has the duty to decide such questions. As Justice Brandeis wrote, concurring in St. Joseph Stock Yards v. United States, 298 U.S. 38, 84, 56 S.Ct. 720, 740, 80 L.Ed. 1033 (1936), "The supremacy of law demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied and whether the proceedings in which facts were adjudicated was conducted regularly." See also United States v. Morgan, 307 U.S. 183, 191, 59 S.Ct. 795, 83 L.Ed. 1211 (1939).

Since the Commission's erroneous determination that the products were of like grade and quality was an essential element of its cease and desist order, the petition to set aside the order is granted. We do not render any decision on the other questions presented in the case. The Petitioner's arguments concerning injury to competition and its cost justification defense seem to have considerable merit, but we do not pass on them here. The holding that the products were not of like grade and quality requires us to set aside the Commission's order and makes it unnecessary for us to consider the other points raised.

Petition to set aside the cease and desist order is

Granted.