# FEDERAL TRADE COMMISSION *v.* BORDEN CO.

No. 106.   Argued January 19, 1966.—Decided March 23, 1966.

*Robert B. Hummel* argued the cause for petitioner. With him on the brief were *Solicitor General Marshall, Assistant Attorney General Turner, Daniel M. Friedman, Gerald Kadish* and *James McI. Henderson.*

*John E. F. Wood* argued the cause for respondent. With him on the brief were *Kent V. Lukingbeal, Robert C. Johnston, Philip S. Campbell* and *C. Brien Dillon.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The Borden Company, respondent here, produces and sells evaporated milk under the Borden name, a nationally advertised brand. At the same time Borden packs and markets evaporated milk under various private brands owned by its customers. This milk is physically and chemically identical with the milk it distributes under its own brand but is sold at both the wholesale and retail level at prices regularly below those obtained for the Borden brand milk. The Federal Trade Commission found the milk sold under the Borden and the private labels to be of like grade and quality as required for the applicability of § 2 (a) of the Robinson-Patman Act,[1] held the price differential to be discriminatory

---

[1] Section 2 (a) of the Clayton Act, 38 Stat. 730 (1914), as amended by the Robinson-Patman Act, 15 U. S. C. § 13 (a) (1964 ed.), provides in pertinent part:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person

within the meaning of the section, ascertained the requisite adverse effect on commerce, rejected Borden's claim of cost justification and consequently issued a cease-and-desist order. The Court of Appeals set aside the Commission's order on the sole ground that as a matter of law, the customer label milk was not of the same grade and quality as the milk sold under the Borden brand. 339 F. 2d 133. Because of the importance of this issue, which bears on the reach and coverage of the Robinson-Patman Act, we granted certiorari. 382 U. S. 807. We now reverse the decision of the Court of Appeals and remand the case to that court for the determination of the remaining issues raised by respondent Borden in that court. Cf. *Federal Trade Comm'n* v. *Anheuser-Busch, Inc.,* 363 U. S. 536, 542.

The position of Borden and of the Court of Appeals is that the determination of like grade and quality, which is a threshold finding essential to the applicability of § 2 (a), may not be based solely on the physical properties of the products without regard to the brand names they bear and the relative public acceptance these brands enjoy—"consideration should be given to all commercially significant distinctions which affect market value, whether they be physical or promotional." 339 F. 2d, at 137. Here, because the milk bearing the Borden brand regularly sold at a higher price than did the milk with a buyer's label, the court considered the products to be "commercially" different and hence of different "grade" for the purposes of § 2 (a), even though they were physically identical and of equal quality. Although a mere

who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered . . . ."

difference in brand would not in itself demonstrate a difference in grade, decided consumer preference for one brand over another, reflected in the willingness to pay a higher price for the well-known brand, was, in the view of the Court of Appeals, sufficient to differentiate chemically identical products and to place the price differential beyond the reach of § 2 (a).

We reject this construction of § 2 (a), as did both the examiner and the Commission in this case. The Commission's view is that labels do not differentiate products for the purpose of determining grade or quality, even though the one label may have more customer appeal and command a higher price in the marketplace from a substantial segment of the public. That this is the Commission's long-standing interpretation of the present Act, as well as of § 2 of the Clayton Act before its amendment by the Robinson-Patman Act,[2] may be gathered from the Commission's decisions dating back to 1936. *Whitaker Cable Corp.,* 51 F. T. C. 958 (1955); *Page Dairy Co.,* 50 F. T. C. 395 (1953); *United States Rubber Co.,* 46 F. T. C. 998 (1950); *United States Rubber Co.,* 28 F. T. C. 1489 (1939); *Hansen Inoculator Co.,* 26 F. T. C. 303 (1938); *Goodyear Tire & Rubber Co.,* 22 F. T. C. 232 (1936). These views of the agency are entitled to respect, *Federal Trade Comm'n* v. *Mandel Brothers, Inc.,* 359 U. S. 385, 391, and represent a more reasonable construction of the statute than that offered by the Court of Appeals.[3]

---

[2] A proviso to § 2 of the original Clayton Act excepted price discrimination "on account of differences in the grade, quality, or quantity of the commodity sold . . . ." 38 Stat. 730 (1914).

[3] The commentators are somewhat divided on the dispute involved in this case. Supporting the Commission's view are the Report of The Attorney General's National Committee to Study the Antitrust Laws 158 (1955); Austin, Price Discrimination and Related Problems under the Robinson-Patman Act 39 (2d ed. 1959); Patman, The Robinson-Patman Act 27 (1938); Edwards, The Price Discrimina-

Obviously there is nothing in the language of the statute indicating that grade, as distinguished from quality, is not to be determined by the characteristics of the product itself, but by consumer preferences, brand acceptability or what customers think of it and are willing to pay for it. Moreover, what legislative history there is concerning this question supports the Commission's construction of the statute rather than that of the Court of Appeals.

During the 1936 hearings on the proposed amendments to § 2 of the Clayton Act, the attention of the Congress was specifically called to the question of the applicability of § 2 to the practice of a manufacturer selling his product under his nationally advertised brand at a different price than he charged when the product was sold under a private label. Because it was feared that the Act would require the elimination of such price differentials, Hearings on H. R. 4995 before the House Committee on the Judiciary, 74th Cong., 2d Sess., p. 355, and because private brands "would [thus] be put out of business by the nationally advertised brands," it was suggested that the proposed § 2 (a) be amended so as to apply only to sales of commodities of "like grade, quality and *brand*." (Emphasis added.) *Id.,* at 421. There was strong objection to the amendment and it was not adopted by the Committee.[4] The rejection of this

tion Law 31, 463–464 (1959); Seidman, Price Discrimination Cases, reprinted in 2 Hoffmann's Antitrust Law and Techniques 409, 424–428 (1963). Contrary views are expressed by a minority of the Attorney General's Committee; in Rowe, Price Discrimination Under the Robinson-Patman Act 75 (1962); and in Cassady & Grether, The Proper Interpretation of "Like Grade and Quality" within the Meaning of Section 2 (a) of the Robinson-Patman Act, 30 So. Cal. L. Rev. 241 (1957).

[4] Mr. H. B. Teegarden, who was then counsel to the United States Wholesale Grocers Association, and who apparently played a large part in drafting the bill, Hearings on H. R. 4995 before the House

amendment assumes particular significance since it was
pointed out in the hearings that the legality of price dif-
ferentials between proprietary and private brands was
then pending before the Federal Trade Commission in
*Goodyear Tire & Rubber Co.*, 22 F. T. C. 232. By
the time the Committee Report was written, the Com-
mission had decided *Goodyear*. The report quoted from
the decision and interpreted it as holding that *Goodyear*
had violated the Act because "at no time did it offer to
its own dealers prices on Goodyear brands of tires which
were comparable to prices at which respondent was sell-
ing tires of equal or comparable quality to Sears, Roe-
buck & Co." H. R. Rep. No. 2287, 74th Cong., 2d Sess.,
p. 4.

---

Committee on the Judiciary, 74th Cong., 1st Sess., p. 9, supplemented
his oral testimony with a letter addressed in part to the proposed
amendment:

"To amend the bill by inserting 'and brands,' after the words
'commodities of like grade and quality,' as suggested by Judge Wat-
kins, although it may seem harmless at first sight, is a specious sug-
gestion that would destroy entirely the efficacy of the bill against
larger buyers. So amended, the bill would impose no limitation
whatever upon price differentials, except as between different pur-
chasers of the same brand. But where goods are put up under a
private brand, there can only be one purchaser, namely the one for
whom the brand is designed. Neither Kroger nor any independent
could use an A. & P. private brand of canned fruit, for example; and
to so amend the bill would leave every manufacturer free to put up
his standard goods under a private brand for a particular purchaser
and give him any price discount or discriminations that he might
demand.

"Under the Patman bill as it stands, manufacturers are still free
to put up their products under private brands; but if they do so
for one purchaser under his private brand, then they must be ready
to do so on the same terms, relative to their comparative costs, for
a competing purchaser under his private brand; and unless that
equality of treatment is required and assured, the discriminations
at which the bill is aimed cannot be suppressed." *Id.*, 2d Sess., at
469.

During the debates on the bill, Representative Pat-
man, one of the bill's sponsors, was asked about the pri-
vate label issue. His brief response is wholly consistent
with the Commission's interpretation of § 2 (a), 80 Cong.
Rec. 8115:

> "Mr. TAYLOR of South Carolina. There has
> grown up a practice on the part of manufacturers of
> making certain brands of goods for particular chain
> stores. Is there anything in this bill calculated to
> remedy that situation?
>
> "Mr. PATMAN. . . . I have not time to discuss
> that feature, but the bill will protect the independ-
> ents in that way, because they will have to sell to
> the independents at the same price for the same
> product where they put the same quality of mer-
> chandise in a package, and this will remedy the sit-
> uation to which the gentleman refers.
>
> "Mr. TAYLOR of South Carolina. Irrespective
> of the brand.
>
> "Mr. PATMAN. Yes; so long as it is the same
> quality. . . ."

The Commission's construction of the statute also
appears to us to further the purpose and policy of the
Robinson-Patman Act. Subject to specified exceptions
and defenses, § 2 (a) proscribes unequal treatment of dif-
ferent customers in comparable transactions, but only if
there is the requisite effect upon competition, actual or
potential. But if the transactions are deemed to involve
goods of disparate grade or quality, the section has no
application at all and the Commission never reaches
either the issue of discrimination or that of anticompeti-
tive impact. We doubt that Congress intended to fore-
close these inquiries in situations where a single seller
markets the identical product under several different
brands, whether his own, his customers' or both. Such

transactions are too laden with potential discrimination and adverse competitive effect to be excluded from the reach of § 2 (a) by permitting a difference in grade to be established by the label alone or by the label and its consumer appeal.[5]

If two products, physically identical but differently branded, are to be deemed of different grade because the seller regularly and successfully markets some quantity of both at different prices, the seller could, as far as § 2 (a) is concerned, make either product available to some customers and deny it to others, however discriminatory this might be and however damaging to competition. Those who were offered only one of the two products would be barred from competing for those customers who want or might buy the other. The retailer who was permitted to buy and sell only the more expensive brand would have no chance to sell to those who always buy the cheaper product or to convince others, by experience or otherwise, of the fact which he and all other dealers already know—that the cheaper product is actually identical with that carrying the more expensive label.

The seller, to escape the Act, would have only to succeed in selling some unspecified amount of each product to some unspecified portion of his customers, however large or small the price differential might be. The seller's pricing and branding policy, by being successful, would apparently validate itself by creating a difference

---

[5] Borden argues that it spends large sums to ensure the high quality of its Borden brand milk on customers' shelves, inferring that there really is a difference between its own milk and the milk sold under private labels, at least by the time it reaches the consumer. Of course, if Borden could prove this difference, it is unlikely that the case would be here. The findings are to the contrary in this case and we write on the premise that the two products are physically the same at the time of consumer purchase. Borden's extra expenses in connection with its own milk are more relevant to the cost justification issue than to the question we have before us.

in "grade" and thus taking itself beyond the purview of the Act.[6]

Our holding neither ignores the economic realities of the marketplace nor denies that some labels will command a higher price than others, at least from some portion of the public. But it does mean that "the economic

---

[6] The market acceptability test would hardly stop with insulating from inquiry the price differential between proprietary and private label sales. That test would also immunize from the Act sales at different prices of the same product under two different producer-owned labels, the one being less advertised and having less market acceptability than the other. And if it is "consumer preferences," dissenting opinion, p. 648, which create the difference in grade or quality, why should not Borden be able to discriminate between two purchasers of private label milk, as long as one label commands a higher price from consumers than the other and hence is of a different grade and quality? In this context perhaps the market acceptability test would be refined to preclude this differential on the grounds that Borden's customer, as distinguished from the consumer, will not pay more than his competitor for private label milk and therefore the milk sold by Borden under one private brand is really of the same grade and quality as the milk sold under the other brand even though ultimate consumers will pay more for one than the other. Taking this approach, if Borden packed for one wholesale customer under two private labels, one having more consumer appeal than the other because of the customer's own advertising program, Borden must sell both brands at the same price it charges other private label customers because all such milk is of the same grade and quality. At the same time, the customer buying from Borden under two labels could himself sell one label at a reduced price without inquiry under § 2 (a) because the milk in one container is no longer of the same grade and quality as that in the other, although both the milk and the containers came from Borden. Such an approach would obviously focus not on consumer preference as determinative of grade and quality but on who spent the advertising money that created the preference—Borden's customer, not Borden, created the preference and hence the milk is of the same grade and quality in Borden's hands but not in its customer's. The dissent would exempt the effective advertiser from the Act. We think Congress intended to remit him to his defenses under the Act, including that of cost justification.

factors inherent in brand names and national advertising should not be considered in the jurisdictional inquiry under the statutory 'like grade and quality' test." Report of The Attorney General's National Committee to Study the Antitrust Laws 158 (1955). And it does mean that transactions like those involved in this case may be examined by the Commission under § 2 (a). The Commission will determine, subject to judicial review, whether the differential under attack is discriminatory within the meaning of the Act, whether competition may be injured, and whether the differential is cost-justified or is defensible as a good-faith effort to meet the price of a competitor. "[T]angible consumer preferences as between branded and unbranded commodities should receive due legal recognition in the more flexible 'injury' and 'cost justification' provisions of the statute." *Id.,* at 159. This, we think, is precisely what Congress intended. The arguments for exempting private brand selling from § 2 (a) are, therefore, more appropriately addressed to the Congress than to this Court.[7]

The Court of Appeals suggested that the Commission's views of like grade and quality for the purposes of § 2 (a) cannot be squared with its rulings in cases where a seller presents the defense under § 2 (b)[8] that he is in good

---

[7] This is not, of course, a helpful suggestion to those who think the congressional remedy would be "very difficult if not impossible" and who thus prefer the more "reasonable approach" through the courts. See Cassady & Grether, *supra,* n. 3, at 277.

[8] Section 2 (b), 15 U. S. C. § 13 (b) (1964 ed.), provides as follows:

"Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of serv-

faith meeting the equally low price of a competitor.[9] In those cases, it is said, the Commission has given full recognition to the significance of the higher prices commanded by the nationally advertised brand "in holding that a seller who reduces the price of his premium product to the level of his non-premium competitors is not merely meeting competition, but undercutting it." 339 F. 2d, at 138.

The Commission, on the other hand, sees no inconsistency between its present decision and its § 2 (b) cases. In its view, the issue under § 2 (b) of whether a seller's lower price is a good-faith meeting of competition involves considerations different from those presented by the jurisdictional question of "like grade and quality" under § 2 (a).

We need not resolve these contrary positions. The issue we have here relates to § 2 (a), not to § 2 (b), and we think the Commission has resolved it correctly. The § 2 (b) cases are not now before us and we do not venture to decide them. The judgment of the Court of Appeals is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEWART, with whom MR. JUSTICE HARLAN joins, dissenting.

I cannot agree that mere physical or chemical identity between premium and private label brands is, without

---

ices or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

[9] The Court of Appeals relied upon *Callaway Mills Co., sub nom. Bigelow-Sanford Carpet Co.,* CCH Trade Reg. Rep. Transfer Binder, 1963–1965, ¶ 16,800; *Anheuser-Busch, Inc.,* 54 F. T. C. 277 (1957); *Standard Oil Co.,* 49 F. T. C. 923 (1953); and *Minneapolis-Honeywell Regulator Co.,* 44 F. T. C. 351 (1948). Borden adds *Gerber Products Co. v. Beech-Nut Life Savers Co.,* 160 F. Supp. 916 (D. C. S. D. N. Y. 1958).

more, a sufficient basis for a finding of "like grade and quality" within the meaning of § 2 (a) of the Robinson-Patman Act. The conclusion that a product that travels at a premium in the marketplace is of "like grade and quality" with products of inferior commercial value is not required by the language of the Robinson-Patman Act, by its logic, or by its legislative history.

It is undisputed that the physical attributes and chemical constituents of Borden's premium and private label brands of evaporated milk are identical. It is also undisputed that the premium and private label brands are not competitive at the same price, and that if the private label milk is to be sold at all, it must be sold at prices substantially below the price commanded by Borden's premium brand.[1] This simple market fact no more than reflects the obvious economic reality that consumer preferences can and do create significant commercial distinctions between otherwise similar products. By pursuing product comparison only so far as the result of laboratory analysis, the Court ignores a most relevant aspect of the inquiry into the question of "like grade and quality" under § 2 (a): Whether the products are different in the eyes of the consumer.[2]

---

[1] For example, one wholesaler, a witness for the Commission, stated:

"Private label merchandise is no good for nobody unless there is a price on it. . . . In the retail trade as a whole they haven't been too much interested in [private label evaporated milk] . . . frankly if it was the same price as advertised or 15 cents or 25 cents a case under, it wouldn't sell, they couldn't give it away. . . . It has got to have $1.50 or $2 a case spread to make it interesting."

[2] No suggestion is made that any of the private label brands involved in this case show significant commercial differentiation from one another. It is possible, of course, that by extensive promotion private label brands could achieve consumer acceptance equivalent to that of a premium brand. In that situation, the products would still be economically different under the market test of § 2 (a) eluci-

There is nothing intrinsic to the concepts of grade and quality that requires exclusion of the commercial attributes of a product from their definition. The product purchased by a consumer includes not only the chemical components that any competent laboratory can itemize, but also a host of commercial intangibles that distinguish the product in the marketplace.[3] The premium paid

dated in this opinion, since the relevant comparison would exclude promotional efforts by persons other than the producer of the premium brand. Thus, promotional activities by customers of Borden in the present case could not affect the determination of "like grade and quality" with regard to sales by Borden. Cf. Jordan, Robinson-Patman Act Aspects of Dual Distribution by Brand of Consumer Goods, 50 Cornell L. Q. 394, 406-407 (1965).

[3] Cf. Chamberlin, The Theory of Monopolistic Competition 56 (8th ed. 1962):

"A general class of product is differentiated if any significant basis exists for distinguishing the goods (or services) of one seller from those of another. Such a basis may be real or fancied, so long as it is of any importance whatever to buyers, and leads to a preference for one variety of the product over another. Where such differentiation exists, even though it be slight, buyers will be paired with sellers, not by chance and at random (as under pure competition), but according to their preferences.

"Differentiation may be based upon certain characteristics of the product itself, such as exclusive patented features; trade-marks; trade names; peculiarities of the package or container, if any; or singularity in quality, design, color, or style. . . . In so far as these and other intangible factors vary from seller to seller, the 'product' in each case is different, for buyers take them into account, more or less, and may be regarded as purchasing them along with the commodity itself."

See also Brown, Advertising and the Public Interest: Legal Protection of Trade Symbols, 57 Yale L. J. 1165, 1181 (1948):

". . . The buyer of an advertised good buys more than a parcel of food or fabric; he buys the pause that refreshes, the hand that has never lost its skill, the priceless ingredient that is the reputation of its maker. All these may be illusions, but they cost money to create, and if the creators can recoup their outlay, who is the poorer? Among the many illusions which advertising can fashion are those

for Borden brand milk reflects the consumer's awareness, promoted through advertising, that these commercial attributes are part and parcel of the premium product he is purchasing.[4] The record in the present case indicates that wholesale purchasers of Borden's private label brands continued to purchase the premium brand in undiminished quantities. The record also indicates that retail purchasers who bought the premium brand did so with the specific expectation of acquiring a product of premium quality.[5] Contrary to the Court's suggestion,

---

of lavishness, refinement, security, and romance. Suppose the monetary cost of compounding a perfume is trivial; of what moment is this if the ads promise, and the buyer believes, that romance, even seduction, will follow its use? The economist, whose dour lexicon defines as irrational any market behavior not dictated by a logical pecuniary calculus, may think it irrational to buy illusions; but there is a degree of that kind of irrationality even in economic man; and consuming man is full of it."

[4] For example, a grocer testified in the proceedings before the Commission that:

"People are going into a grocery store to pick up groceries, the majority of the people buy something that is advertised that they have known for years or heard of for years or see highly advertised. They know it is a good product, they know it is fancy merchandise or best quality."

Another grocer testified that:

"A. Some people say they want [Borden's] Silver Cow milk. In other words, for maybe a coupon on the side of the can or because they have been educated to want that brand. Some of them won't have anything but that. Some of them won't have anything except Carnation, and some of them don't want anything except Pet.

"Q. They don't care what price—

"A. If the doctor tells the woman to put the baby on Pet milk, that is all she wants, you couldn't interest her in something else.

"Q. You couldn't give her something else, could you?

"A. I doubt if I could."

[5] The results of a house-to-house survey conducted for Borden by National Analysts, Inc., indicated that consumers selected Borden's premium brand because of its superior quality. Comparable

*ante,* p. 644, this consumer expectation cannot accurately be characterized as a misapprehension. Borden took extensive precautions to insure that a flawed product did not reach the consumer.[6] None of these precautions was taken for the private brand milk packed by Borden.[7] An important ingredient of the premium brand inheres in the consumer's belief, measured by past satisfaction and the market reputation established by Borden for its products, that tomorrow's can will contain the same premium product as that purchased today. To say, as the Court does, that these and other intangibles, which comprise an important part of the commercial value of a product, are not sufficient to confer on Borden's premium brand a "grade" or "quality" different from that of private label brands is to ignore the obvious market acceptance of that difference. "[C]ommercially the 'advertised' brands had come in the minds of the public to mean a different grade of milk. The public may have

studies have reached a similar conclusion. Cf. "Mom Feels Quality, not Ad Cost, Makes Brand Item Costlier, 'Good House' Reports," Advertising Age, Dec. 7, 1964, p. 30.

[6] Borden's Food Products Division maintained a staff of field representatives who inspected code-datings on cans of Borden brand milk in retail stores, in order to insure that older milk was sold first off the retailer's shelves. A witness for Borden testified that the principal dangers of long storage were discoloration of the milk, precipitation of calcium and other minerals, and separation and hardening of fat from the milk. As a further precaution against sales of defective milk, Borden dispatched its milk to wholesalers and retailers under a first-packed, first-shipped rotation plan that occasionally involved high-cost shipments from distant plants or warehouses. In addition, before shipment from a cold storage warehouse, Borden "tempered" its premium brand milk in order to prevent condensation on the cans, which might have resulted in rust to the cans and damage to the labels.

[7] As counsel for the respondent candidly stated on oral argument to the Court, "The difference as to the private label brand packed by Borden is that, as to that product, the Borden Company washes its hands of it at the factory door."

been wrong; . . . it may have been right . . . . But right or wrong, that is what it believed, and its belief was the important thing." *Borden's Farm Products Co.* v. *Ten Eyck,* 11 F. Supp. 599, 601 (D. C. S. D. N. Y.) (opinion of L. Hand, J.).[8]

The spare legislative history of the Robinson-Patman Act is in no way inconsistent with a construction of § 2 (a) that includes market acceptance in the test of "like grade and quality." That history establishes no more than that mere differences in brand or design, unaccompanied by any genuine physical, chemical, or market

---

[8] The Court's suggestion that the commentators are about equally divided upon the issue before us is somewhat misleading. It is true that the members of the Attorney General's National Committee to Study the Antitrust Laws, Report, pp. 156–159 (1955), were sharply divided as to whether significant consumer preferences should be taken into account under the "like grade and quality" test of § 2 (a). However, the very brief discussions of "like grade and quality" in Austin, Price Discrimination and Related Problems under the Robinson-Patman Act 39 (2d ed. 1959); Patman, Complete Guide to the Robinson-Patman Act 34–35 (1963); and Edwards, The Price Discrimination Law 31, 463–464 (1959), are not addressed to the relevance of significant consumer preferences, and the minimal discussion in Seidman is at best ambiguous, Price Discrimination Cases, reprinted in 2 Hoffmann's Antitrust Law and Techniques 409, 427–428 (1963). Those cursory treatments go no further than the view, with which I wholly agree, that no blanket exemption from § 2(a) is available for private label brands. But that view in no sense disposes of the concrete issue presented in this case. Commentators who have in fact focussed on the significance of consumer preferences uniformly favor inclusion of commercial acceptance in the test of "like grade and quality." Rowe, Price Differentials and Product Differentiation: The Issues under the Robinson-Patman Act, 66 Yale L. J. 1 (1956); Rowe, Price Discrimination Under the Robinson-Patman Act 62–76 (1962); Cassady & Grether, The Proper Interpretation of "Like Grade and Quality" within the Meaning of Section 2 (a) of the Robinson-Patman Act, 30 So. Cal. L. Rev. 241 (1957); Jordan, Robinson-Patman Act Aspects of Dual Distribution by Brand of Consumer Goods, 50 Cornell L. Q. 394 (1965).

distinction, are insufficient to negate a finding of "like grade and quality" under § 2 (a).[9]  Nothing that I have found in the legislative history speaks with precision to the sole issue before us here, the application of § 2 (a) to physically or chemically identical products that are in fact differentiated by substantial market factors.[10]

Neither the remarks of Representative Patman, *ante,* p. 643, nor the letter of Mr. Teegarden, *ante,* p. 641, n. 4, supports the Court's conclusion that Congress intended physical and chemical identity to be the sole touchstone of "like grade and quality."  Aside from the obviously casual nature of Mr. Patman's reply to the question con-

---

[9] The Court's suggestion, *ante,* p. 644, that a difference in label alone would exclude the reach of § 2 (a) if a market test were accepted for "like grade and quality" is no part of the present case and has never been offered as a serious interpretation of § 2 (a). Nor is there any issue raised here as to whether, under a market test of § 2 (a), a dubious pricing and branding policy adopted by a seller could "validate itself" and escape the Act by creating precarious distinctions in grade or quality. The price differential between Borden's premium and private label brands is concededly grounded upon a legitimate and stable market preference for the premium product. Moreover, the Commission's willingness to engage in the exhaustive analysis of injury to competition and cost justification under its "physical identity" test of § 2 (a) demonstrates that the Commission's resources would be more than adequate to determine the level of commercial preference sufficient to negate a finding of "like grade and quality" under a market test of § 2 (a).

[10] Certain general language in the congressional reports may be taken, however, as supporting the interpretation that market factors are relevant in the construction of § 2 (a). The Report of the House Committee on the Judiciary stated that the general object of the bill was "to amend section 2 of the Clayton Act so as to suppress more effectually discriminations between customers of the same seller *not supported by sound economic differences in their business positions* . . . ." H. R. Rep. No. 2287, 74th Cong., 2d Sess., p. 7. (Emphasis added.) The Report of the Senate Committee on the Judiciary is phrased in substantially the same language. S. R. Rep. No. 1502, 74th Cong., 2d Sess., p. 3.

cerning the effect of the Act on private label brands,[11] his remarks go embarrassingly further than the circumspect reading sought to be given them by the Court.   On its face, Mr. Patman's statement makes the blanket assertion that all products of the same quality must be sold at the same price.   As thus stated, premium brands would have to be sold at the same price as private label brands, regardless of injury to competition, cost justification, or other available defenses under the Act.   These undifferentiated remarks are therefore of little assistance in the determination of congressional intent.   Far from supporting the Court's interpretation of § 2 (a), the final paragraph of the Teegarden letter suggests that Mr. Teegarden considered the bill to have no effect on a premium brand producer's decision to furnish private label brands to purchasers, so long as the private label brands were made available on the same terms to all purchasers. Mr. Teegarden's concern was with the prevention of discrimination between purchasers on the basis of artificial differences in brand.[12]   That same concern, and no more,

---

[11] The remarks of Representative Patman were even more offhand than the opinion of the Court indicates.   Prefacing the portion of his remarks quoted by the Court, Mr. Patman said, "I only have a very short time, and I must finish my statement.   I have not time to discuss that feature . . . ."

[12] The predominant concern of Congress in enacting the Robinson-Patman amendments to the Clayton Act was to abolish the notorious price discriminations that infected the post-Depression economy, especially the blanket immunity then available for quantity discounts under § 2 of the Clayton Act.   An obvious commercial evil at the time was the widespread practice of offering private label brands to favored customers at rates substantially lower than the rates offered to competing purchasers.   The abortive attempt, vigorously opposed by Mr. Teegarden, to introduce "and brands" into the "like grade and quality" provision would have left that evil completely unremedied.   Cf. 80 Cong. Rec. 8234–8236 (rejection of amendments proposing the addition of "and design" and "purchased under like conditions" to the "like grade and quality" clause).

is all that may legitimately be read into the rejection by Congress of the proposal to add "and brands" to the "like grade and quality" provision in the bill. By rejecting that proposal, it can be inferred only that Congress contemplated "no *blanket* exemption . . . for 'like' products which differed *only* in brand . . . , leaving open the application of the Act to differentiated products reflecting more than a nominal or superficial variation." Rowe, Price Discrimination Under the Robinson-Patman Act 65 (1962).

The references in the legislative hearings and the House Committee Report to the Commission's decision in *Goodyear Tire & Rubber Co.*, 22 F. T. C. 232, are equally inconclusive on the relevance of commercial acceptance to the determination of "like grade and quality." The striking aspect of that case is that Goodyear *conceded* that the differently branded tires involved in the proceeding were of like grade and quality, 22 F. T. C., at 290. Moreover, the tires purchased by Sears, Roebuck & Co. from Goodyear and sold under Sears' "All State" label were advertised by Sears as obtained from "the leading tire manufacturer" and "the world's foremost tire manufacturer," so that the market independence of Sears' private brand was compromised. *Id.,* at 295, 297.

The other administrative precedents relied on by the Court also fail to establish any consistently settled interpretation by the Federal Trade Commission that physical identity is the sole touchstone of "like grade and quality." Those decisions singularly fail to focus on the significance of consumer preference as a relevant factor in the test of grade and quality.[13] Moreover, the

---

[13] In *Hansen Inoculator Co.*, 26 F. T. C. 303, and the two *United States Rubber Co.* cases, 28 F. T. C. 1489; 46 F. T. C. 998, the finding of "like grade and quality" was either conceded by the respondent or not challenged. In addition, in *Hansen Inoculator*, there was significant evidence that the private label product was in fact trading

Commission has itself explicitly resorted to consumer preference or marketability to resolve the issue of "like grade and quality" in cases where minor physical variations accompany a difference in product brand.[14] The

on the reputation of the premium product. Further, in *Hansen Inoculator*, as in *Page Dairy Co.*, 50 F. T. C. 395, it is doubtful that even the labels on the two products were distinguishable. In *Whitaker Cable Corp.*, 51 F. T. C. 958, the resale prices of both products were identical, so that no commercial preference could have been proved in any event. Finally, in the first *United States Rubber* case and in *Whitaker Cable Corp.*, there was substantial discrimination by the seller between various purchasers of the private label brands. In setting aside the order of the Commission in the present case, the Court of Appeals for the Fifth Circuit emphasized that in none of these cases was there any showing that the brand names affected the market price of the products sold.

[14] *Universal-Rundle Corp.*, CCH Trade Reg. Rep. Transfer Binder, 1963–1965, ¶ 16948, at pp. 22003–22005 (F. T. C. Dkt. 8070, June 12, 1964) (differences in plumbing fixtures); *Quaker Oats Co.*, CCH Trade Reg. Rep. Transfer Binder, 1963–1965, ¶ 17134, at p. 22215 (F. T. C. Dkt. 8112, Nov. 18, 1964) (differences in flour blends). Compare *E. Edelmann & Co.*, 51 F. T. C. 978 (differences in automobile replacement parts); *Bruce's Juices, Inc.* v. *American Can Co.*, 87 F. Supp. 985, aff'd 187 F. 2d 919 (C. A. 5th Cir.) (differences in size of juice cans); *Champion Spark Plug Co.*, 50 F. T. C. 30 (differences in insulator and "ribs" of spark plugs). Cf. Comment, Like Grade and Quality: Emergence of the Commercial Standard, 26 Ohio State L. J. 294, 296–302 (1965). The Commission appears at one time to have held that brand identity may create a presumption of "like grade and quality," regardless of the existence of physical differences between the products. *General Foods Corp.*, 52 F. T. C. 798, 817; *Atalanta Trading Corp.*, 53 F. T. C. 565, 571. In setting aside the Commission's order in *Atalanta*, the Court of Appeals for the Second Circuit stated that "The test of products of like grade and quality was evolved to prevent emasculation of the section by a supplier's making artificial distinctions in his product but this does not mean that all distinctions are to be disregarded." *Atalanta Trading Corp.* v. *FTC*, 258 F. 2d 365, 371. In a footnote to that opinion, the Court of Appeals indicated that price differences were among the distinctions to be considered. *Id.*, at 371, n. 5. Cf. Rowe, Price Discrimination Under the Robinson-Patman Act 71–72 (1962).

caprice of the Commission's present distinction thus invites Borden to incorporate slight tangible variations in its private label products, in order to bring itself within the Commission's current practice of considering market preferences in such cases.

The Commission's determination of "like grade and quality" under § 2 (a) in this case is seriously inconsistent with the position it has taken under § 2 (b) in cases where a seller has presented the defense that he is in good faith meeting the equally low price of a competitor. The Commission decisions are clear that the "meeting competition" defense is not available to a seller who reduces the price of his premium product to the level of nonpremium products sold by his competitors. The Commission decisions under § 2 (b) emphasize that market preference must be considered in determining whether a competitor is "meeting" rather than "beating" competition. In *Standard Oil Co.,* 49 F. T. C. 923, 952, the Commission put it baldly:

> "[I]n the retail distribution of gasoline public acceptance rather than chemical analysis of the product is the important competitive factor." [15]

---

[15] See also *Minneapolis-Honeywell Regulator Co.,* 44 F. T. C. 351, 396–397: "To accept [the contrary] proposition would mean that any seller of a commodity which generally sells at a premium price may freely discriminate among its customers so long as it does not undercut the prices of competitors"; *Anheuser-Busch, Inc.,* 54 F. T. C. 277, 302: "It is evident that Budweiser could and did successfully command a premium price in the St. Louis market . . . . The test in such a case is not necessarily a difference in quality but the fact that the public is willing to buy the product at a higher price in a normal market"; *Callaway Mills Co., sub nom. Bigelow-Sanford Carpet Co.,* CCH Trade Reg. Rep. Transfer Binder, 1963–1965, ¶ 16,800, at p. 21755 (F. T. C. Dkt. 7634, Feb. 10, 1964): "Both the courts and the Commission have consistently denied the shelter of the [meeting competition] defense to sellers whose product, because of . . . intense public demand, normally commands a price higher than that usually received by sellers of competitive goods"; *Standard*

Could the Commission under § 2 (b) now prevent Borden from reducing the price of its premium milk to the level of private label milk? I can see no way that it could, short of maintaining a manifestly unstable equilibrium between § 2 (a) and § 2 (b). By adopting a keyhole approach to § 2 (a), the Court manages to escape resolution of the question, but it does so at the cost of casting grave doubt on what I had regarded as an important bulwark of § 2 (b) against a recognized competitive evil.

The Court gives no substantial economic justification for its construction of § 2 (a).[16] The principal rationale of the restriction of that section to commodities of "like

---

*Brands, Inc.*, 46 F. T. C. 1485, 1495; *Gerber Products Co.* v. *Beech-Nut Life Savers, Inc.*, 160 F. Supp. 916, 920, 921–922 (D. C. S. D. N. Y.). Cf. *Porto Rican American Tobacco Co.* v. *American Tobacco Co.*, 30 F. 2d 234, 237 (C. A. 2d Cir.). In the present case, the Court of Appeals for the Fifth Circuit specifically refused to "approve of the Commission's construing the Act inconsistently from one case to the next, as appears most advantageous to its position in a particular case." 339 F. 2d 133, at 139. See the comment of Commissioner Mason: "First the Commission finds you guilty of price discrimination by disregarding popularity of goods, and finds the grade and quality of the commodities in question are the same; then they knock out your meeting of competition defense because your goods are more popular than others, even if the commodities in question are of like grade and quality." Discriminate in Price between Different Purchasers of Commodities of Like Grade, Quality and Popularity, Proc. Am. Bar Assn. Section of Antitrust Law 82, 91–92 (Aug. 1953). Cf. Eine Kleine Juristische Schlummergeschichte, 79 Harv. L. Rev. 921, 928–929 (1966).

[16] The Court's brief discussion of the adverse economic effect of the Fifth Circuit's ruling is concerned primarily with the supposed injury to secondary line competition. The present proceeding arose as the direct result of the primary line injury caused to midwestern packers of private label evaporated milk when Borden expanded its plants in Tennessee and South Carolina to include private label operation, but the opinion of the Court nowhere discusses such competition.

grade and quality" is simply that it is not feasible to measure discrimination and injury to competition where different products are involved. That rationale is as valid for economic as for physical variation between products. Once a substantial economic difference between products is found, therefore, the inquiry of the Commission should be ended, just as it is ended when a substantial physical difference is found.

In spite of the assertion of the Attorney General's Report quoted by the Court, it is unlikely that economic differences between premium and private label brands can realistically be taken into account by the Commission under the "injury to competition" and "cost justification" provisions of § 2 (a).[17] Even if relevant cost data can be agreed upon, the cost ratio between Borden's premium and private label products is hardly the most significant factor in Borden's pricing decision and market return on those products. Moreover, even if price discrimination is found here, its effect on competition may prove even more difficult to determine than in more con-

---

[17] It is not clear that the "injury to competition" and "cost justification" issues will be reached on the remand. As the opinion of the Court suggests, *ante*, p. 646, the existence of price discrimination is an issue that remains open in the Court of Appeals. If Borden is able to demonstrate that the price differential between its premium and private label brands is not a price discrimination, the inquiry by the Commission is at an end, and no issue of injury to competition or cost justification under § 2 (a) is reached. Nothing in *FTC* v. *Anheuser-Busch, Inc.*, 363 U. S. 536, a case concerned only with territorial price discrimination, requires an equation in all circumstances between a price differential and price discrimination. So long as Borden makes private label brands available to all customers of its premium milk, it is unlikely that price discrimination within the meaning of § 2 (a) can be made out. *Boss Mfg. Co.* v. *Payne Glove Co.*, 71 F. 2d 768, 770–771 (C. A. 8th Cir.); Austin, Price Discrimination and Related Problems under the Robinson-Patman Act 21 (2d ed. 1959); Rowe, Price Discrimination Under the Robinson-Patman Act, *supra*, at 97–99.

ventional cases of price discrimination under § 2 (a).
Cf. *FTC* v. *Morton Salt Co.*, 334 U. S. 37; *United Biscuit
Co.* v. *FTC*, 350 F. 2d 615 (C. A. 7th Cir.).

The threat presented to primary line competition by
Borden's distribution of premium and private label
brands is unclear. No allegation was made that Borden
has used its dominant position in the premium brand
market to subsidize predatory price-cutting campaigns
in the private label market. Borden packs its private
label brands for national distribution, so that this case
is essentially different from those in which geographical
price discriminations are involved. Further, Borden's
private label brands are aimed in part at a different, more
price-conscious class of consumer. Because relevant eco-
nomic factors differ in the premium and private label
markets, conventional notions of price discrimination
under the Robinson-Patman Act may not be applicable.[18]
More important, Borden's extensive distribution of its
private label brands has introduced significant low-cost
competition for Borden's own premium product. Thus,
the large retail chains and cooperative buyer organiza-
tions that are Borden's chief private label customers rep-
resent a significant source of countervailing power to the
oligopoly pattern of evaporated milk production. The
rise of this sort of competition is well known in other
parts of the food industry.[19] In these circumstances, the
anticompetitive leverage against primary line competi-
tion available to Borden through its private label pro-
duction is sharply curtailed. There is, therefore, no real
resemblance in this case to the serious discriminatory

---

[18] Cf. Adelman, Price Discrimination as Treated in the Attorney
General's Report, 104 U. Pa. L. Rev. 222, 228–230 (1955).

[19] See Staff Report to the Federal Trade Commission, Economic
Inquiry into Food Marketing, Part II, The Frozen Fruit, Juice
and Vegetable Industry (1962); Jordan, *supra*, n. 8, at 413–417.

practices that the Robinson-Patman Act was enacted to prevent.

The potential economic impact of Borden's distribution of private label brands on secondary line competition is equally ambiguous. It is true that a market test of "like grade and quality" would enable Borden, so far as § 2 (a) is concerned, to make private label brands selectively available to customers of its premium brand. Not all wholesale and retail dealers who carry Borden's premium brand would be able, as of right, to take advantage of Borden's private label production. But the Commission could still apply § 2 (a) with full force against discriminations between private label customers. And the Government could still invoke § 2 of the Sherman Act or § 5 of the Federal Trade Commission Act to deal with other forms of price discrimination by Borden against its customers or competitors.

Under the Court's view of § 2 (a), Borden must now make private label milk available to all customers of its premium brand.[20] But that interpretation of § 2 (a) is

---

[20] The Commission concedes that there is no evidence in the record that Borden refused to sell private label milk to any customer who specifically requested it. Borden's private label business in the period covered by these proceedings was substantial. In 1957, Borden sold 4,300,000 cases of its premium brand evaporated milk and 1,100,000 cases of private label milk (government and export business excluded); net sales of these products were $27,600,000 and $5,700,000, respectively. A major source of Borden's private label business was provided by cooperative associations of wholesalers and retailers, so that, in fact, there was an opportunity for large numbers of small retailers to compete in the sale of private label brands of evaporated milk obtained from Borden. One such group, whose purchases accounted for 11% of Borden's private label volume in 1957, had more than 1,000 retailer members. Not all retailers, however, availed themselves of the opportunity to market private label milk. One wholesaler testified that, a year after his private label brand had been offered to the 600 retail grocers in his service area, only 50 of the grocers had become regular customers.

hardly calculated to speed private label brands to the shelves of retailers. To avoid supplying a private label brand to a premium brand customer, Borden need only forgo further sales of its premium brand to that customer. It is, therefore, not unlikely that the Court's decision will foster a discrimination greater than that which it purports to eliminate, since retailers previously able to obtain the premium Borden brand but not a private label brand, may now find their access to the premium brand foreclosed as well.

In *Automatic Canteen Co.* v. *FTC,* 346 U. S. 61, 63, this Court cautioned against construction of the Robinson-Patman Act in a manner that might "give rise to a price uniformity and rigidity in open conflict with the purposes of other antitrust legislation." Today that warning goes unheeded. In the guise of protecting producers and purchasers from discriminatory price competition, the Court ignores legitimate market preferences and endows the Federal Trade Commission with authority to disrupt price relationships between products whose identity has been measured in the laboratory but rejected in the marketplace. I do not believe that any such power was conferred upon the Commission by Congress, and I would, therefore, affirm the judgment of the Court of Appeals.