**WILLIAM INGLIS & SONS BAKING CO., a corporation, et al., Plaintiffs,**

v.

**ITT CONTINENTAL BAKING COMPANY, INC., a corporation, et al., Defendants.**

**ITT CONTINENTAL BAKING COMPANY, INC., a corporation, et al., Counterclaimants,**

v.

**WILLIAM INGLIS & SONS BAKING CO., a corporation, et al., Counterclaim Defendants.**

**No. C–71–1906–SW.**

United States District Court, N. D. California.

Jan. 21, 1975.

Michael H. Khourie, Royce H. Schulz, Eugene C. Crew, Broad, Khourie & Schulz, San Francisco, Cal., Harold Greenwald, Richard B. Kelly, New York City, for plaintiffs.

Richard S. Haas, Harvey Leiderman, Brobeck, Phleger & Harrison, San Francisco, Cal., James A. Velde, John T. Cusack, Gardner, Carton, Douglas, Chilgren & Waud, Chicago, Ill., for defendants American Bakeries Company and Langendorf United Bakeries, Inc.; Mitchell J. Wiet, Chicago, Ill., of counsel.

Edward L. Foote, Terry M. Grimm, Winston & Strawn, Chicago, Ill., M. Laurence Popofsky, Stephen V. Bomse, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendant Interstate Brands Corp.

Richard J. Archer, Kristina Hanson, Sharon Green, Sullivan, Jones & Archer, San Francisco, Cal., for defendants Campbell-Taggart, Inc., Rainbo Baking Company of Sacramento Valley and Kilpatrick's Bakeries, Inc.; Frederick M. Rowe, Richard C. Lowery, Kirkland, Ellis, Hodson, Chaffetz, Masters & Rowe, Washington, D. C., of counsel.

D. H. Mackaman, Campbell-Taggart, Inc., Dallas, Tex., for Campbell-Taggart, Inc.

Ralph C. Aldrich, Morrison, Foerster, Holloway, Clinton & Clark, San Francis-

co, Cal., Chas. E. Buffon, John H. Schaffer, III, Covington & Burlington, Washington, D. C., for ITT Continental Baking and Di Carlos Bakery.

## MEMORANDUM OPINION

SPENCER WILLIAMS, District Judge.

## INTRODUCTION

Plaintiff, William Inglis & Sons Baking Co. [hereinafter Inglis] is an independent wholesale bakery in the Sacramento Valley area. In 1971, it along with other plaintiffs not involved in this motion, brought this antitrust action against the following other independent wholesale bakeries: ITT Continental Baking [ITT]; American Bakeries Co. [American]; and the holding company, Campbell Taggart [Campbell Taggart] who holds Rainbo of Sacramento, Kilpatrick Bakeries and San Joaquin Bakery.

Plaintiff alleges in its first amended complaint that defendants have violated: the Sherman Antitrust Act, sections 1 and 2, 15 U.S.C. § 1 and § 2; the Robinson-Patman Act amendments to Clayton [hereinafter Robinson-Patman], Clayton Act section 2(a), 15 U.S.C. § 13(a); the Clayton Act, sections 3 and 7, 15 U.S.C. § 14 and § 18; and the California Unfair Trade Practice Act [UPA], specifically Cal.Bus. and Prof.Code sections 17026, 17029, 17030, 17043, 17044, 17045, 17050, 17070, 17078.[1] The proceedings before the court at this time, however, only involve the alleged violations of Robinson-Patman § 2(a) and of the California UPA.

The market with which the parties are concerned geographically encompasses the area of California north of the Tehachapi Mountains and certain border areas of Northern Nevada. However, testimony indicates that the geographic area of major concern does not extend to the north much beyond Redding, California. The product market has been defined as the manufacture and sale of bread and bread-type rolls to grocery stores, restaurants and institutions. Again, testimony indicates that the product line can be more narrowly defined as bread, especially the white one-pound expanded loaf,[2] and hotdog and hamburger rolls. Finally, the temporal market, which has been less clearly defined appears to encompass conduct from 1968 and 1969 through the present.

The one-pound expanded loaf is the prime source of the plaintiff's complaint although other bread products are not infrequently discussed. Generally all parties sell or have sold a one-pound expanded loaf under at least two labels, a nationally advertised brand label and a private label.[3] Plaintiff alleges that although they have and evidently still do sell bread under a private label, any private label program is in violation of Robinson-Patman § 2(a) when it allows a loaf of bread which is of "like kind and quality" as the advertised brand to be sold for a price lower than the advertised brand. Plaintiff further alleges that in this case the private labels have been sold below cost in violation of the UPA.

In July 1974, plaintiff moved this court to preliminarily enjoin defendants from selling their bread products at discriminatory prices and at prices below cost,[4] and from giving rebates and gifts

---

1. Plaintiffs not involved in this motion have also alleged violations of Oregon and Washington statutes.

2. The one-pound expanded loaf is a one-pound loaf baked in a pound-and-a-half-loaf pan so that it expands to the size of the pound-and-a-half loaf.

3. In some instances this loaf is also sold under a secondary label which is a label containing the national brand plus another name. The private brand is usually under a label giving no obvious reference to the national brand.

The National brands in this case are as follows:
ITT—Wonder Bread
American—Langendorf
Campbell Taggart
Rainbo of Sacramento—Rainbo
Kilpatrick's—Kilpatrick
San Joaquin—none

4. It is understood and conceded by plaintiff that any injunctive relief would be equally applicable to it, since what we have here is mutual conduct on the part of all parties.

to their (plaintiff's) customers in order to secure their business.

After extensive oral argument and voluminous briefing, the court requested further information on methods of cost accounting, on parties actual costs and on the affirmative defense of good faith meeting competition. Upon receipt of this information, the court reconvened in September to hear expert testimony on cost accounting and further information on meeting competition. Final arguments were then heard and the matter submitted.

As the defendants constantly reminded the court, the motion seeks a preliminary injunction [5] and thus, before plaintiff can prevail the court must find that:

1. there will be immediate and irreparable harm if the injunctive relief is not granted;

2. plaintiff has a probability of success on the merits;

3. in balancing the equities, the defendants would not be harmed more than plaintiff is helped by the injunction; and

4. it would be in the public's interest to grant the injunction.

See Sierra Club v. Hickel, 433 F.2d 24 (9th Cir. 1970), aff'd 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); C. Tennant v. N. Y. Terminal, 299 F.Supp. 796 (S.D.N.Y.1969).

Although at this juncture the court is of the opinion that there is irreparable injury, that the equities are not weighted in defendants' favor, and that the public interest might well be served by the asked-for relief, it has serious reservations as to the probability of success on the merits. In brief, while the evolution of this market does indicate a tendency toward monopoly, the court is un-

convinced that the purpose of defendants conduct was to injure competition or monopolize.

This conclusion has been reached only after a painstakingly careful analysis of the many complex issues, some of first impression, which are discussed below.

## IRREPARABLE INJURY

Much has been said about the immediate and irreparable injury to the plaintiff if he does not prevail on this motion. Testimony has shown that the Inglis Bakery has been in severe financial difficulties which it attributes to the "dog-eat-dog" competition brought on by the allegedly discriminatory private label pricing and selling below cost. Recent testimony has also shown that Inglis' financial crisis is easing with the constant rise in bread prices.[6] Given these circumstances it is difficult for Inglis to seriously argue immediate and irreparable injury to itself. This is especially so when viewed with the knowledge that plaintiff has allowed almost three years to elapse between the filing of its complaint and the bringing of its motion for preliminary injunction.

Defendants claim that much of Inglis' troubles are due to in-house mismanagement. More as a defense than as an example of lack of irreparable harm, they also argue that if Inglis has been harmed by this market's stiff competition, it is due to *pari delicto*—its equal misconduct. Although this court has rejected the concededly present *pari delicto* as being irrelevant to the charges, it does militate against the urgency of plaintiff's harm and perhaps must be considered in the balancing of the equities hereinafter discussed.

However, it is not the irreparable harm to plaintiff but the obvious immediate and irreparable harm to the mar-

---

5. Injunctive relief is statutorily available for violations of Robinson-Patman § 2(a) and the California UFTP. 15 U.S.C. § 26; Cal. Bus. and Prof.Code § 17070.

6. Inglis' immediate financial crisis was attributed in large part to back taxes owed to the United States Internal Revenue Service. During these hearings, plaintiff and the IRS reached an accommodation which eased some of the immediate pressure and forestalled the likelihood of its collapse.

ket itself which causes the court its greatest concern. Not only is Inglis, one of the last small independent bakeries in this area in danger of being driven out of this market regardless of the fact that its problems may be due to its own ineptitude, but the third largest national independent bakery, American, has shown that not even it can keep pace with the competition generated by this allegedly below cost private label program. If this trend is allowed to continue or resume [7] the geographic area could soon be at the mercy of the two biggest wholesale bakeries in the country, ITT and Campbell Taggart. This would result in an extremely undesirable anticompetitive situation, an eventuality which both Robinson-Patman and the California UPA Act were designed to curtail. See F. T. C. v. Anheuser-Busch, Inc., 363 U.S. 536, 543, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960); Cal.Bus. and Prof.Code § 17001. Accordingly this court finds that there is the likelihood of an immediate and irreparable injury in this market.

## PROBABILITY OF SUCCESS
### Robinson-Patman § 2(a) [8]

■ The elements of a Robinson-Patman § 2(a) violation are threefold: (1) the allegedly violative conduct must meet the "in-commerce" requirements of the Act, (2) there must be a price discrimination between different purchasers of commodities of like grade and quality, and (3) the effect of such discrimination must be to substantially lessen competition or tend to create a monopoly. The establishment of these elements, however, is not alone sufficient to prove a violation since defendants may justify such conduct by establishing that the price differences are due to cost differences or are good faith responses to competitors' prices.

### 1. "In-Commerce" Requirement

■ Under Robinson-Patman § 2(a), it is generally agreed that there are three "in-commerce" requirements for jurisdiction to attach. Borden Co. v. F. T. C., 339 F.2d 953, 955 (7th Cir. 1964). First the defendants must be involved in interstate commerce. Id, citing Standard Oil v. F. T. C., 340 U.S. 231, 71 S. Ct. 240, 95 L.Ed. 239 (1951). There is no doubt that these three defendants are engaged in interstate commerce. They are concededly the largest (ITT), the second largest (Campbell Taggart), and the third largest (American) independent bread wholesalers in the country. Second, the alleged unlawful discrimination must occur in the course of such commerce. Again defendants do not contest that the sales involved herein were in the course of their interstate commerce. The third, that either or any of the purchases involved in such discrimination were in interstate commerce, is vigorously contested.

This final requirement is interpreted to mean that the discriminatory sale alleged to be in violation of the Robinson-Patman Act must be made in interstate commerce, that is *actually across* state lines. Littlejohn v. Shell Oil Co., 483 F. 2d 1140, 1144 (5th Cir. 1973); Continental Baking Co. v. Old Homestead Bread Co., 476 F.2d 97 (10th Cir. 1973). In an endeavor to meet this requirement plaintiff points to the fact that ITT and, at least, Rainbo of Sacramento sell bread

7. The "dog-eat-dog" competition in this market according to testimony has leveled off during this litigation due mostly to the increased cost of many ingredients and services.

8. In pertinent part Robinson-Patman § 2(a) states that,
It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: . . . .

in northern Nevada from their Sacramento Valley bakeries. Plaintiff further alleges that such sales were at prices lower than California prices and as such were discriminatory.[9]

Defendants argue that the only possible transactions within the jurisdiction of this court under Robinson-Patman § 2(a) are those specific transactions across state lines and that if these vest jurisdiction it should be a jurisdiction limited to these specific transactions. Plaintiff however, correctly points out that these few obvious interstate transactions are sufficient under Borden v. F. T. C., *supra* and *Littlejohn, supra*, to bring the whole panoply of alleged intra-state price discriminations within the subject matter jurisdiction requirements of Robinson-Patman § 2(a).

Furthermore, in a similar factual situation [Continental Baking Co. v. Old Homestead Bread, *supra*, 476 F.2d at 109] the court found that where the entire private label program of Continental was being challenged as discriminatory under Robinson-Patman, the fact that that program was also in another state, and Continental concededly serviced several states from their Denver Bakeries, was enough to meet the "in-commerce" requirement.[10]

In addition, there is nothing in the Supreme Court's most recent discussion of Robinson-Patman, Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974) which compels a contrary conclusion since in that case there were *no* discriminatory sales in interstate commerce. *Id.* at p. 194, 95 S.Ct. at p. 398.

In the instant case, therefore, this court finds that given the combination of big interstate wholesale bakeries, the obvious enhancement of their interstate business by these transactions and some allegedly discriminatory sales across state lines, the "in-commerce" requirement for the purposes of Robinson-Patman has been fulfilled.

Finally although the Sherman Act claims are not before this court for this motion, the court has little doubt that the "in-commerce" requirements for the purposes of the Sherman Act have been fulfilled. This being the case, the California UPA claims are correctly before this court as pendent to the Sherman claims even if the Robinson-Patman allegations were not found to be properly here.

### 2. *Price Discrimination*

Plaintiff argues that there is evidence that the nationally advertised brand and the private label are the exact same loaf of bread wrapped differently, that one label is sold at a price less than the other, and that thus there is price discrimination which is prohibited.[11] To bolster this argument, plaintiff alludes to the Supreme Court's strong anti-private label decision in United States v. Topco, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). *Topco*'s facts are inapposite to those involved herein [12] and this court is not persuaded that the entire

---

9. Inglis also alleges that at one point American sold bread in northern Nevada from its San Jose bakery, although it is now conceded that American has not sold bread in Nevada nor, for that matter, in any part of this geographic market for some time.

10. Since it is not as clear that San Joaquin Bakery and Kilpatrick's Bakeries were involved in actual across-state-line commerce, the court does not hold that it has *Old Homestead* jurisdiction as to them.

11. This argument is generally substantiated by the evidence with the possible exception of Wonder Bread and ITT's private label.

There is conflicting evidence about the like grade and quality of these two loaves. Some testimony indicates that sugar rather than a corn syrup is used in Wonder while the syrup is used in the private label. Although there is a conflict in the testimony on this point, a determinative finding on this issue is not required at this time. Thus for the purposes of this discussion likeness will be assumed.

12. In *Topco, supra*, the Supreme Court condemned the private label program therein as a *per se* violation of Sherman § 2. It is true that the Topco defendants argued

concept of private label programs has been forever condemned.

Further plaintiff relies heavily on F. T.C. v. Borden, 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 153 (1966), for the proposition that different prices for the same product due only to different labels and perhaps different consumer appeal is prohibited price discrimination under Robinson-Patman § 2(a). Upon close scrutiny of F.T.C. v. Borden, *Id.*, it becomes apparent that the only question before the Supreme Court was whether different labels and different consumer appeal prevented a physically identical product from being of "like grade and quality" under Robinson-Patman. The Court found that physically identical evaporated milk, regardless of label or consumer appeal, was evaporated milk of "like grade and quality" under Robinson-Patman. The Court. however, did not find this private label program violative of Robinson-Patman.[13] It went on to say that to prevail the F.T.C. must also determine,

" . . . subject to judicial review, whether the differential under attack is discriminatory within the meaning of the Act, whether competition may be injured, and whether the differential is cost justified or is defensible as a good-faith effort to meet the price of a competitor. '[T]angible consumer preferences as between branded and unbranded commodities should receive due legal recognition in the more flexible "injury" or "cost" justification provisions of the statute.'" *Id.*, 383 U.S. at 646, 86 S.Ct. at 1098.

After the Supreme Court decision, the Commission made further findings which were subject to review by the Fifth Circuit in Borden v. F.T.C., 381 F.2d 175 (5th Cir. 1967). There the court found that although the evaporated milk was of like grade and quality and there was a price difference, there was not sufficient evidence that the effect of such price differences substantially lessened competition.[14] The court took note of the following factors in determining that there was no substantial injury to competition: first it found that,

" . . . Borden is not in any sense guilty of predatory behavior similar to that which may accompany territorial price wars. Borden did not subsidize below cost or unrealistically low prices on its private label milk with profits received from sales of the Borden brand." *Id.* at 177.

Second, it found that there was no evidence that Borden had not offered its private label program to any customer requesting it. *Id.* at 178.

In the instant case, for all intents and purposes, the national brand and the private label are of "like grade and quality." There is a price difference between the two labels, but like the Fifth Circuit *Borden* case, there is little or no evidence of predatory intent. These facts standing alone, strongly militate against a finding of price discrimination. There was, however, an inference that the private label program was selectively offered[15] as well as testimony which indicated that private label bread, hotdog and hamburger rolls were

---

strongly that their private label program was a competitive necessity to enable them to compete against the large grocery chains. This is not unlike one of the defendants' claims herein, but in *Topco* the court found horizontal territorial restraints which are *per se* violations of the antitrust laws. In light of that the Supreme Court was unconvinced by the procompetitive argument of *Topco*.

13. In fact, the Court clearly indicated that private label programs, such as the one at issue here, do not violate Robinson-Patman so long as all purchasers are given the same

opportunity to participate. *Id.*, 383 U.S. 641 n. 4, 86 S.Ct. 1092, 16 L.Ed.2d 153.

14. Borden sold its evaporated milk to both retailers and other wholesalers for resale. The court found that there was not sufficient evidence to find injury to competition as to either of these purchasers.

15. In response to a question, Ramey Thomas, witness for Rainbo, testified that they did not provide a private label program to every Mom and Pop Store. Private label offers were usually made to volume accounts or chain stores.

offered to some purchasers at lower prices than to other purchasers. Assuming arguendo that this is sufficient to sustain a *prima facie* showing of price discrimination, a review of the remaining issues reveals the fatal flaw in plaintiff's claim.

### 3. *Effect of Discrimination May be Substantially to Lessen Competition*

It is frequently difficult to establish the anti-competitive effect of a price discrimination and in an attempt to facilitate this process the Courts have resorted to the use of inferences and presumptions to buttress their findings in this regard. For example, while the showing of an intent to injure competition is not required (Balian Ice Cream v. Arden Farms, 231 F.2d 356, 369 (9th Cir. 1955)) the showing of such predatory intent is said to produce an inference of the required anti-competitive effect. And while it might seem that the proof of intent is equally, if not more, difficult than proof of effect, the courts have also held that the trier of fact can find predatory intent,

> " . . . from surrounding economic circumstances which would include persistent unprofitable sales below cost and drastic price cuts themselves discriminatory."

Utah Pie v. Continental Bakery, 386 U.S. 685 at 696–697, fn. 12, 87 S.Ct. 1326, at 1333, 18 L.Ed.2d 406 (1967) ; *See also:* Continental Bakery v. Old Homestead,

*supra*; Cornwell Quality Tools Co., v. C. T. S. Company, 446 F.2d 825 (9th Cir. 1971).

In this case there has been a showing that the subject market is moving toward at least a duopoly controlled by ITT and Campbell Taggart which bodes an obviously anti-competitive situation. However, it is not as clear that this is the "effect" of the alleged price discrimination. Evidence on this point has been weak at best. There has, however, been a fairly strong showing of sales below cost which triggers the above sequence of inferences indicating an anti-competitive effect.

The establishment of "costs" was thus critical to the showing of predatory intent [16] and required our voyaging into the foggy and largely uncharted seas of cost accounting.

The parties differ as to which of two generally acceptable accounting methods may be used to determine costs. Plaintiffs claim that only the fully allocated method is acceptable; [17] defendants argue that the variable or incremental method is proper.[18] At least in the manufacture and sale of bread, the method selected has a great effect on the cost figures that will result.

The plaintiff contends that defendants sell their private label bread and other products at prices below their fully allocated costs. Defendants [19] do not seriously challenge this allegation [20] but argue instead that plaintiffs have shown

---

16. It is also an essential element in the proof of a violation of California UPA.

17. Fully allocated costs as defined for the purposes of this litigation are the direct costs (ingredients, wrappers, and direct sales and labor) and the indirect costs (management, overhead for both plant and home office, indirect labor, etc.) apportioned pro-rata to each unit of production.

18. Variable or incremental costs (sometimes referred to by the parties as marginal costs) are defined for the purposes of this litigation as the direct costs per unit of production (ingredients, wrappers and direct sales and labor), without any apportioned indirect costs or with only selected or limited apportioned indirect costs. It is described essen-

tially as the cost of producing "one more unit" or group of units after all, or substantially all of the indirect costs have been absorbed by allocation to prior production.

19. Although American has regularly employed a variable cost method, they have taken the position herein that fully allocated costing is the intent of the law and variable costing is not appropriate when sales below cost is the issue.

20. The court requested cost studies indicate that ITT and American do sell their private label below a fully allocated cost. Campbell Taggart's studies indicate that their prices are above their fully allocated costs as they have been calculated. As will be discussed *infra*, the court is not entirely satisfied with

no authority which precludes use of the incremental method for determining cost for either Robinson-Patman or UPA. The court agrees that there is no prior authority on the point but disagrees that any costing method other than fully allocated is permissible.

■ The basis for the concern over below-cost sales is the damaging effect it is likely to have on the market, and ultimately on consumers. Competition in the longrun will be damaged and possibly destroyed where below-cost price wars result in driving competitors from the market. Where such below-cost sales directly result in loss of profitability the likelihood of market damage is obvious. This proposition is conceptually less difficult if we were to assume that each competitor sells but one product—say an expanded one-pound white loaf—and only in one market. Thus, if the total return from product sales does not cover the total expenses of operation, including direct and indirect costs,[21] a loss of profitability would result. The problem becomes more complex, however, if the competitors in the marketplace sell other products in the same and different markets, if each competitor has differest lines of products, and if each possesses different degrees of economic strength. Assume for the purpose of this illustration that a multi-product company is in competition with a single-product company. In such a situation, the multi-product company using the variable cost method could allocate major indirect cost items disproportionately to a non-bread line, and allocate little or nothing to his bread prod-

ucts. Accordingly, he could claim "costs" far below those his single-product competitor could claim and set prices above his "costs" that his competitor could not meet without suffering losses. Even though the multi-product competitor could claim overall "profitability"[22] the resultant damage to competition—and the bread market—is self-evident.

Furthermore, once the multi-product competitor has dominated the bread market, he could increase his bread prices, disproportionately allocate indirect costs to bread, and using the same incremental costs theory attack some other competitor's product line or market with unrealistically low prices.

■ Accordingly, it is the view of this court that any costing method that does not allocate both the direct costs of a specific product and a fair share of the total overhead to that product is so fraught with opportunities for abuse to be acceptable for the purpose of Robinson-Patman or UPA cost determinations.[23]

The testimony also demonstrated that even when a fully allocated cost method is employed, the ultimate cost figures still vary widely depending upon how indirect costs or portions of indirect costs are allocated. For instance, in its study, American allocated its indirect costs based upon pounds produced. ITT allocated most of its indirect costs on the basis of oven hours, but allocated its indirect sales costs according to net wholesale list prices. Campbell Taggart allocated all of its indirect costs according to net wholesale list prices. Inglis advocates allocation based on unit loaves.

the allocation methods employed by defendants in arriving at their fully allocated cost figures.

21. Direct costs are those ingredient labor and sales costs obviously attributable to the unit produced. Indirect costs are those expenditures required to maintain the entire operation which must be allocated by some formula method since they cannot easily be directly attributed to any one unit.

22. Campbell Taggart has persistently argued that regardless of their cost-price structure

their operation is one of the few which has been constantly profitable. The Court does not argue with this position but is of the opinion that under these circumstances consistent profitability is not determinative and may even be more symptomatic of potential monopolistic power than competitive efficiency.

23. This is not to say that variable costing is all bad. It is indeed a valuable tool for a variety of management decisions such as market expansion and overall profitability.

As a result all parties arrived at radically different figures even though most cost items were similar.[24]

The court is cognizant of the fact that many methods of allocation can be and are acceptable accounting methods for any number of purposes. But the court is of the opinion that for the purpose of sales below cost, allocation according to sales price or any other basis which bears no relationship to the burden the production and distribution of the product has on overall costs is as meaningless as variable costing.[25] Thus for these purposes, to be legally acceptable, allocation of indirect costs must be reasonably related to the burden such product imposes on the overall cost of doing business.

The court is therefore of the opinion, and finds, that each defendant's selling price of its one-pound expanded loaf is below fully allocated costs when indirect costs are apportioned, as they must be, on some method reasonably related to actual costs. Thus it is not unreasonable to assume that such sales could form the basis upon which a trier of fact may ascertain predatory intent and from which an inference of anticompetitive effects may be drawn. Hence plaintiffs have made a *prima facie* case of a Robinson-Patman violation although their probability of success is lessened by the defendants' affirmative defenses discussed *infra*.

### Good Faith Meeting Competition

Both Robinson-Patman § 2(a) and Cal.Bus. and Prof.Code § 17050 statutorily exempt any *prima facie* violations if the challenged conduct can be shown to have been a good faith effort to meet competition.[26] All defendants claim two things: first that it is necessary for them to sell their bread products at what are claimed to be discriminatory prices or below cost prices to meet the competition of the so-called "captive bakeries";[27] second that every incident of claimed discriminatory prices or prices below costs were in response to a competitor's equally low price.

There has been much discussion but scant testimony on the issue of meeting the competition of captive bakeries. While the court is inclined to share the view taken in a 1967 F.T.C. report[28] that the realities of the market *do* pit independent wholesale bakeries against captive bakeries even though their private label products never directly compete on the same shelf, it is not determinative here.[29]

24. There were also minor differences in the indirect cost items included in these studies which also accounts for some differences in the figures.

25. Testimony of defendants' management representatives indicates that for the most part prices have been set in this market according to their perception of what the market would bear or what the competition was doing. Thus allocating indirect costs according to these prices is tantamount to allocating costs according to any arbitrary variable not related to actual costs.

26. Robinson-Patman 2(b) in pertinent part, That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor. Cal.Bus. and Prof.Code § 17050(d).

The prohibitions of this chapter against locality discriminations, sales below cost, and loss leaders do not apply to any sale made:

 (d) in an endeavor made in good faith to meet the legal prices of a competitor selling the same article or product, in the same locality or trade area and in the ordinary channels of trade.

27. "Captive bakeries" are those bakeries owned by large grocery chains, such as Safeway, which service only their own stores with bread products under their own label.

28. Report of the Federal Trade Commission, Economic Report on the Baking Industry, November, 1967.

29. Controlling authorities however currently reject this theory. In both F.T.C. v. Sun Oil, 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963) and Continental Baking Co. v. Old Homestead, *supra*, the courts found that the wholesalers who were not themselves involved in retailing could not assert a § 2(b)

As to meeting competitors' prices, defendants argue that although it is difficult to tell who started this cut throat competition, their lower prices were merely responses either to each others' prices or plaintiff's prices. Plaintiff, of course, questions the fact of this assertion, but further questions whether meeting competition here was in good faith, and whether this defense is even available for the purpose of acquiring new business rather than merely keeping current business.

 Plaintiff incorrectly asserts that this defense is only available to save old customers. Both Sunshine Biscuit, Inc. v. F. T. C., 306 F.2d 48 (7th Cir. 1962) and Cadigan v. Texaco, 492 F.2d 383 (9th Cir. 1974) specifically reject this premise.

 Plaintiff argues correctly that the meeting competition defense is only viable if defendants were meeting in good faith what they knew not to be unlawful prices. See F. T. C. v. A. E. Staley, 324 U.S. 746, 65 S.Ct. 971, 89 L. Ed. 1338 (1945); Corn Products v. F. T. C., 324 U.S. 726, 65 S.Ct. 961, 89 L. Ed. 1320 (1945). However,

> "[a] defendant need not prove actual lawfulness of his competitor's price in order to secure the protection of the proviso. The well established rule is that § 2(b) is satisfied unless it appears that the defendant . . . knows the price being met is unlawful." Cadigan v. Texaco, *supra* 492 F.2d at 387.

There is no convincing evidence that defendants knew the prices they purportedly met were unlawful. Plaintiff does point to the fact that Continental Baking's [ITT] costs were found in other litigation prior to these incidents and those costs were substantially more than

the bread prices herein.[30] Plaintiff then argues that knowledge of these costs is imputed to, at least, ITT thus ITT knew or should have known that prices below that figure were highly suspect. This argument is very attenuated and not highly convincing at this stage of the proceedings. This is especially so in light of the fact that testimony from all parties indicates that they operated with little concern or knowledge of what their actual costs were.

 The court is equally unconvinced by the plaintiff's proposition that unless every incident of discrimination or sales below cost was documented specifically as an effort to meet competition it is not a good faith effort. Defendants cannot maintain this defense based upon vague generalities amounting to rumor or hearsay. See Corn Products v. F. T. C., *supra*. It seems that the ". . . statute, at least requires the seller, who has knowingly discriminated in price, to show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." F. T. C. v. Staley, *supra* 324 U.S. at 760, 65 S.Ct. at 977.

For the hearing this court randomly selected six (6) meeting competition incidents documented by the parties. The parties were then each given an opportunity to discuss two additional incidents. Of all the incidents chosen, not one evidenced a blatant disregard for meeting competition in good faith. In most instances there were meeting competition forms for the lowered price and where there were not, there were, at least, reasonable excuses. The only incidents which seemed suspect were when the Nielson brand of San Joaquin Bakery

---

defense against retailers since they were functioning in two different markets.

30. In Georgia Sandas v. Kilpatrick Bakeries, Inc. et al., No. 38831, filed in the Superior Court for the State of California, County of Santa Cruz, Defendant Continental Baking Co. caused to be filed on July 29, 1968 an-

swers to plaintiff's interrogatories in which Continental indicated that its cost for the sandwich bread was 20.43 cents and its costs for the Round Top loaf was 19.58 cents. See answers to interrogatory 13. At one point in this temporal market ITT Continental sold its bread for 17.2 cents.

(Campbell Taggart) and ITT lowered their price for the entire line based upon a lower competitive price in one store. This is marginally within the parameters of the defense but is not so damaging as to negate the whole defense.

Under all the circumstances, the court cannot say that whatever *prima facie* showing has been made of violation under Robinson-Patman has not been adequately negated by this affirmative defense. Thus it is not possible for this court to find that the plaintiffs probably will succeed on the merits on its Robinson-Patman claims.

Furthermore, an evaluation of these facts as applied to UPA do not compel a different conclusion.

The most significant UPA charge is the alleged violation of § 17043 (Sales Under Cost; Gifts) which states:

"It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition."

 As with Robinson-Patman § 2(a) there are several elements which must be established before a violation is proven. First the alleged violator must be engaged in business in this State. Second, he must sell below cost or give away something. Finally, he must have acted with the intent to injure competitors or destroy competition.

The first requirement is obviously present.

The second requirement, selling below cost has already been fully discussed above. The same analysis employed there is equally applicable to these alleged violations.

 California's statutory scheme does not comprehensively deal with all the cost problems involved in this case. Section 17026 defines costs as:

"Cost as applied to production includes the cost of raw materials, labor and all overhead expenses of the producer."

Section 17029 defines costs of doing business as:

". . . all costs of doing business incurred in the conduct of business and shall include without limitation the following items of expense: labor (including salaries of executives and officers), rent, interest on borrowed capital, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance and advertising."

Neither statute specifically addresses how these costs should be allocated but the very language of § 17026 and § 17029, certainly describes the use of some type of fully allocated cost computation. The California Supreme Court reached the same conclusion in Tri-Q, Inc. v. Sta-Hi Corp., 63 Cal.2d 199, 45 Cal.Rptr. 878, 881, 404 P.2d 486, 489 (1965), wherein it found that in a study done to show costs on the disputed item, cost was "'. . . computed to include an allocation of selling, administrative and general expense which is required by the provisions of the California Business and Professions Code Sections 17026 and 17029.'" Thus it would seem, and this court so finds, that the California Legislature has ruled out the use of incremented or variable costing for the purposes of determining whether sales are below costs.

The final element of the sales below cost provision is similar to the anti-competitive effect finding required under Robinson-Patman. Section 17043 requires that sales below costs and gifts be done ". . . for the purpose of injuring competitors or destroying compe-

---

31. Cal.Bus. and Prof.Code § 17071, Intent to injure competitors or destroy competition; evidence:

In all actions brought under this chapter proof of one or more acts of selling or giving away any article or product below cost or at discriminatory prices, together with proof of the injurious effect of such acts, is presumptive evidence of the purpose or intent to injure competitors or destroy competition.

tition." Section 17071 [31] builds into the statute a presumption of the required predatory purpose upon a finding of sales below cost together with proof of injurious effects of such acts.

The California Supreme Court explains that ". . . the Legislature deemed that injury to a competitor or destruction of competition was an 'injurious effect,' and therefore within the ban of the act; and that it was not necessary to await success in the monopolistic effort before the measures provided to safeguard the public interest and welfare could be invoked." People v. Pay Less Drug Store, 25 Cal.2d 108, 113, 153 P.2d 9, 12 (1944).

The necessary element is intent to injure. The plaintiff has not made a showing satisfactory to the court that defendants sold below cost for the intent to injure competition. In Dooley's Hardware Mart v. Food Giant Markets, Inc., 21 Cal.App.3d 515, 98 Cal.Rptr. 543 (1971), the court not only found that the § 17071 presumption was rebutted by the meeting competition defense, but also found it was never applicable in that case because there was insufficient evidence that ". . . the conduct [loss leader sales] diverted trade from or otherwise injured Food Giant's competitors generally or Dooley's in particular." Likewise here, even though there have been sales below costs and there has been injury to competition as evidenced by the evolving duopoly, it cannot be said that plaintiff has made a sufficient showing that the injury to it or to the market has been caused by the defendants' sales below cost. Thus the court finds that the probability of success on this charge is questionable absent a more definitive showing of intent to injure or causal relationships between the injury to competition and the complained of sales below cost.

Furthermore, although plaintiff points to several incidents where it claims it lost business due to a defendant selling below both plaintiff's cost and defendants' cost, these incidents are subject to defendants' affirmative defense of good faith meeting competition, also fully discussed above.

In summary, the plaintiff has made, at best, a tenuous showing of probability of success on the merits. The requisite anti-competitive effects and intent to injure competition, even with the statutory and case law presumptions, have not been established to the satisfaction of the court. The strong meeting competition evidence tends to obviate what *prima facie* violations there may be. But these findings are not, nor are they meant to be, conclusive. At this stage of development probability of plaintiff's success on these two charges is not good.

## BALANCE OF THE EQUITIES—PUBLIC INTEREST

As mentioned previously, this injunction would not be so detrimental to defendants as to militate against its issuance. But it is unnecessary to discuss this element in detail since the doubtfulness of the probability of success defeats the injunction.

Likewise, the public interest is best served by stimulating competition and staving off monopolistic development. And although the court is of the impression that competition is being smothered in this market, it is not in the public's interest for this court to curtail behavior which at this point in the case is doubtfully illegal under either Robinson-Patman or the California Unfair Trade Practice Act.

■ The motion for preliminary injunction is hereby denied. Parties are urged to proceed diligently to a determination on the merits of these charges and the Sherman Act counts.